# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| SHELLEY CONVERSET, | : | |
| Plaintiff, | : | Case No. 3:12cv00020 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Chief Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Shelley Converset brings this case challenging the Social Security Administration's denial of her May 2007 application for Disability Insurance Benefits.  She asserted throughout her administrative proceedings that she is under a "disability" within the meaning of the Social Security Act.  Her disability began, she contends, on June 1, 2005 due to spinal stenosis, depression, right knee injury, and high cholesterol.

 The Social Security Administration's denial of Plaintiff's application for benefits occurred mainly through the non-disability decision of Administrative Law Judge (ALJ) Amelia G. Lombardo.  (Doc. #7, PageID at 53-67).  ALJ Lombardo's nondisability

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

determination and the resulting denial of benefits later became the final decision of the

Social Security Administration.  Such final decisions are subject to judicial review, *see* 42

U.S.C. § 405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the

Commissioner's Memorandum in Opposition (Doc. #12), the administrative record (Doc.

#7), and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and awarding her Disability

Insurance Benefits.  Plaintiff also contends an Order remanding this matter would be

appropriate in light of certain new and material evidence she submitted to the Appeals

Council.

The Commissioner seeks an Order affirming the denial of Plaintiff's application for

benefits.

## II.    BACKGROUND

### A.    <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 58 years old on the date of the ALJ's decision and on the date she was

last insured under the program for Disability Insurance Benefits.  She was thus considered a

person of "advanced age" for purposes of resolving her DIB application.  *See* 20 C.F.R. §

404.1563(e).  She attended school into the twelfth grade education but did not graduate.  She

has worked as an administrative assistant and a customer service representative.

The administrative law judge summarized Plaintiff's testimony at the administrative

hearing as follows:

The claimant testified that she is 63.5 inches tall and weighs 200 pounds. She lives in a one story home with a basement. She lives with her husband and 20 year old son who is autistic. She said her son has Asperger's Syndrome and is high functioning, but he cannot live alone. She said she lived in Texas for a total of eight and a half years because she took her son there for schooling. She said she returned to Ohio and home-schooled him further. The claimant also has an older son who calls her but is not allowed to come to the house because of his alcohol and drug abuse. Her middle son lives three blocks from her home.

The claimant testified that her middle son performs her housework every week, but she does cook as long as she can sit on her rolling stool. She cooks three to four times a week. Her son does the dishes and her husband and son do the laundry. She said she shops with some assistance or her husband does the shopping. She said she cannot bend over and, therefore, she cannot do as much as she used to do. The claimant testified that she plays cards, watches TV, and crochets when her hands "cooperate." She said she leaves the house sometimes only once a week to go to doctor appointments. She said she used to go to church weekly, but she stopped four or five years ago because it was difficult to get up and around. She used to go out to eat with her friends or to other functions, but, because they no longer call her, she does not think they want to deal with how she is right now.

The claimant alleges disability due to back and knee problems. She said she broke her knee and had surgery, but the doctors did not know how to put her knee back together, so they performed a bone graft and inserted some screws, which she still has today. She had rehabilitation for close to a year, but she could not kneel then just like she cannot kneel now. She said she can bend her knee only halfway. She has had numerous arthroscopic tests and the doctor wanted to remove the screws, but the screws were too imbedded. She sees a specialist twice a year. The claimant testified that her back has bothered her for 13 or 14 years. She first thought her back pain was related to her knee until her doctor sent her for an MRI and she went to see a neurologist. She said the neurologist said surgery would not accomplish much since she might have relief for a few years, but the problems would continue. Dr. Dean, her family doctor who she sees every two months, manages her pain. She went to a pain clinic, but the medications were causing problems and they were not working anyway. She said her pain moves from her back to her left hip and down toward her knee. She said sometimes her pain i[s] only on her left side,

3

while at other times it is on her right side or both sides.  The claimant testified that she had carpel tunnel surgery in 2009.  She said she had a tremor in her hand prior to the surgery.  She and the surgeon have talked about treating her tremor but the doctor does not think there is much that can be done; however, she will be seeing a neurologist anyway.  She said she has a problem with two fingers of her hand now.  The claimant also testified that she has panic attacks, including one driving to the hearing, due to driving and the wind.  She takes [A]tivan for these attacks.  She said she does not have attacks as long as she takes her medication, but it really depends on the situation.  She said she has constipation from her pain medication.  She has been taking [O]pana for two to three years now and it takes the edge off her pain, but the pain is always there.  She said her pain is a six or seven on a scale of ten.

The claimant testified that she can stand for 10 minutes and sit for 30 minutes, but she has to move about and change position.  She said she has been using a cane for two to three years and it was prescribed by her specialist because she fell three or four times.  She testified that she can walk one-half block but would possibly not be able to walk all the way back without stopping.  She is able to climb stairs one at a time.  She can lift four to five pounds.

The claimant testified that she performed clerical work and was an administrative assistant.  She said her clerical duties included typing, answering the phone, and others duties as assigned.  She said her manager believed in her and found her good jobs even though she did not have the education.  The claimant said she left her past job because of her medical impairments and because she moved back to Ohio from Texas and the expenses were too great to remain.  She said she cannot perform her past work because she does not sleep well and is too tired and irritable.  She said she cannot sit for long periods of time.  She said she likes to give 150% to her job and she does not think it would be fair to the employer or the other workers to give only 40% to 50%.  She said she does not feel like she can work because she cannot do a satisfactory job.

(Doc. #7, PageID at 55-56)(footnote added).

**B.** **Medical Evidence**

Plaintiff and the ALJ have provided detailed and informative descriptions of

Plaintiff's medical records and other pertinent evidence.  *See* Doc. #9, PageID at 360-67;

4

Doc. #7, PageID at 57-61.  In light of this, and upon consideration of the entire administrative record, there is no need to fully reiterate their descriptions.  Yet, because Plaintiff challenges the ALJ's assessment of the medical source opinions, those opinions along with the central objective evidence are worth description.

**1.**
**Drs. Dean and Koppenhoefer**

Plaintiff relies on the opinions of Jacob Dean, M.D., who has been Plaintiff's primary care physician since 2004.  The record contains Dr. Dean's treatment notes from September 2005 to July 2009.  *See* Doc. #7, PageID at 224-42, 275-88, 292-324, 343-48.  During that time, Dr. Dean treated Plaintiff on 24 occasions for various conditions including nasal congestion, headache/migraine, moderately severe low-back pain radiating down to her left thigh and down to her right thigh, spinal stenosis, insomnia, bilateral knee pain, and right lower-extremity pain.

An MRI of Plaintiff's lumbar spine dated July 3, 2006 showed a broad-based disc bulge with marked facet arthropathy and ligamentus hypertrophy causing mild central canal stenosis.  The MRI further showed a combination of broad-based disc bulge, facet arthropathy, and ligamentus hypertrophy at L4-5 resulting in mild central canal stenosis.  And the MRI revealed a combination of 2.0-3.0 mm central herniation with marked facet arthropathy and ligamentus hypertrophy at L5-S1 resulting in moderate central canal stenosis.  (Doc. #7, PageID at 206).

About ten months later, Dr. Dean ordered an MRI of Plaintiff's lumbar spine, which

5

occurred on May 18, 2007.  The report from this MRI stated that the "[f]indings [were] not significantly changed from the previous examination of 2006."  (Doc. #7, PageID at 288). The report noted moderate broad-based bulging of Plaintiff's L4-5 disc and moderate to marked central stenosis, and moderate broad-based bulging of Plaintiff's L2-3, L3-4, and L5-S1 disc with slight central stenoses at these levels.

X-rays of Plaintiff's right tibia on April 21, 2008 showed degenerative changes involving her knee and ankle with post-traumatic and operative changes involving her proximal tibia.  (Doc. #7, PageID at 304).

On May 1, 2009, Dr. Dean completed a physical residual functional capacity questionnaire.  (Doc. #7, PageID at 325-28).  He noted that he had seen Plaintiff every three months since 2004.  Dr. Dean diagnosed Plaintiff with spinal stenosis and insomnia.  Her symptoms included daily low-back pain and difficulty walking.  According to Dr. Dean, Plaintiff's clinical findings and objective signs included moderate broad-based bulging of her L4-5 disc; L5-S1 disc herniation with moderate broad-based bulging of her L5-S1 disc as well as her L2 and L3 discs; and moderate central stenosis with marked arthropathy at L3-L4.  Treatment with pain medication caused drowsiness, dizziness, and nausea.  (Doc. #7, PageID at 325).

Dr. Dean opined that Plaintiff could rarely lift/carry less than ten pounds in a competitive work situation; stand/walk or sit for less than two hours total in an eight-hour workday; sit for 30 minutes at one time, and stand for 20 minutes at one time.  Plaintiff must be allowed to change positions every 15 to 30 minutes; she needs to take unscheduled breaks

every 30 minutes for 20-30 minutes; she needs to elevate her legs if sitting for a prolonged time; and she must use an assistive device when standing or walking.  She could never twist, climb ladders, crouch/squat or stoop, and she could rarely climb stairs.  Dr. Dean also reported that anxiety affected and contributed to the severity of Plaintiff's symptoms and functional limitations.  Dr. Dean opined that Plaintiff is unable to perform even low stress jobs.  (Doc. #7, PageID at 326).  And he estimated that Plaintiff would be absent from work more than four days per month as a result of her impairment or treatment.  *Id*., PageID at 328.

Plaintiff also relies on the opinion of examining physician, Ron Koppenhoefer, M.D., who examined her on May 27, 2009.  (Doc. #7, PageID at 329-33). Dr. Koppenhoefer specializes in physical and rehabilitative medicine.  *Id*, Page  329.  He examined Plaitniff at the request of her attorney.  Dr. Koppenhoefer acknowledged that Plaintiff had applied for benefits due to problems with her right knee and low back.

Dr. Koppenhoefer noted that Plaintiff's "gait for distances he observed in the office was abnormal."  (Doc. #7, PageID at 330).  He explained, "She did use a cane in her left hand when the right leg was in stance phase.  Significant antalgia was noted when her right leg was in stance phase with a trunk lurch to the right.  *Id*.  "Antalgia" exists when a patient assumes a specific posture or gait to avoid or lessen pain.  *See* Taber's Cyclopedic Medical Dictionary at 806 (19th Ed. 2001).

Dr. Koppenhoefer reported that on quiet standing, Plaintiff's right knee showed an "extreme amount of genu valgus deformity."  (Doc. #7, PageID at 330).  "Genu valgus"

refers to a condition involving a knock-kneed appearance where the knees are very close together and the ankles are apart.  *See* Taber's at 1122. On quiet standing Plaintiff's left leg was one-half inch longer than her right, secondary to the genu valgus deformity.  (Doc. #7, PageID at 331).

Dr. Koppenhoefer found that motion involving Plaintiff's cervical spine was full for her age.  But motion involving her lumbosacral spine was limited in all planes secondary to pain:  "Flexion was to 40 degrees, extension 5 degrees, right, left lateral bending 10 degrees.  Range of motion of the hip joints were full and Patrick's test [for hip arthritis, Taber's at 1528] was normal.  Straight leg raising caused back pain bilaterally at 40 degrees."  (Doc. #7, PageID at 330-31).

Dr. Koppenhoefer's examination of Plaintiff's left knee revealed marked crepitation (a clicking or crackling sound) involving her patellofemoral joint.  Her left knee "was judged to be stable," her range of left-knee motion was full and resisted motion caused her no pain.  *Id.*, PageID at 331.

Plaintiff's right knee was a different story.  Dr. Koppenhoefer noted a well-healed lateral scar.  He noted instability in the medial and lateral planes and joint-line discomfort upon right-knee palpation.  Dr. Koppenhoefer also found marked patellofemoral crepitation upon active and passive motion of Plaintiff's right knee, and patellofemoral compression caused discomfort.  *Id.*, PageID at 331.

Dr. Koppenhoefer listed the following 10 categories of medical records he read and reviewed.

8

1.   The cover letter dated 5/12/09.

2.   MRI of the lumbar spine dated 7/3/06 interpreted by Dr. Lemming revealed degenerative changes of the L3-4, L4-5 and L5-S1 level. Moderate central canal stenosis was noted in the LF-S1 level secondary to marked facet arthropathy, ligamentous hypertrophy and a central disc herniation.

3.   Dr. Dean's form dated 5/12/09.

4.   Treatment notes of Dr. Dean.

5.   Dr. Thompson's letter to Dr. Dean dated 10/1/07.  In this letter he indicated that x-rays of the right knee showed valgus joint space narrowing with retained 4.5 millimeter screw osteophytes, post traumatic degenerative joint disease was noted.  Degenerative changes were also noted involving the patellofemoral joint.

6.   MRI of the lumbar spine dated 5/18/07 showed findings not significantly changed from the previous exam of 2006.  Moderate to marked central stenosis was noted at the L4-5 level secondary to degenerative changes.  Slight central stenosis was noted at the L5-S1 level.

7.   Treatment notes from Dr. Watson which indicated numerous types of injections were performed.  His ... 'electrodiagnostic exam' dated 1/3/06 was reviewed.  It was noted that an EMG examination was not done at that time.

8.   MRI of the lumbar spine interpreted by Dr. Turek dated 10/1/04 revealed degenerative changes from L2 through S1 with diffuse spinal stenosis of mild to moderate degree noted.

9.   Treatment notes of Dr. Thompson which indicated that Supartz injections were performed on both knees.

10.   Dr. Green's review dated 8/6/07.

(Doc. #7, PageID at 331-32).

Dr. Koppenhoefer next set forth his diagnoses and opinions:

Based on my examination, I believe Ms. Converset presents with severe

osteoarthritic changes involving the right knee.  Her physical exam was
compatible with severe changes involving her right knee which is causing her
significant amount of limitations.  Based on my examination, I believe that
osteoarthritic changes involving her right knee meets the listing of 1.02 of
major dysfunction of a joint.  It is noted that she has limitation of motion,
instability, and chronic joint pain and stiffness which have been proven on the
x-rays taken in the past and would have shown progression since those x-rays.
Her ability to ambulate effectively is limited secondary to the severe valgus
deformity which is present on today's examination.

(Doc. #7, PageID at 332).

Dr. Koppenhoefer next recognized that Plaintiff has been diagnosed with lumbar

stenosis by several MRI studies.  He opined, "the multiple levels involved would meet the

listing of 1.04," *id.*, describing a "Disorders of the Spine."  Dr. Koppenhoefer reasoned:

Based on my examination, I believe Ms. Converset has significant limitations
in regards to her ability to walk.  Her ability to walk would be up to five
minutes.  Her ability to stand would probably be severely limited and would be
limited to times of approximately five minutes.  Her back condition would
prevent her from doing activities which would require bending and stooping
greater that the occasional basis.  She would be able to lift and carry in the
competitive work situation on an occasional basis less than 10 pounds, on a
rare basis 10 to 20 pounds.  She was unable to do stooping, crouching,
squatting, climb ladders, or very rarely climb stairs with the proper use of
railings....

There are no limitations in regards to the use of her upper extremities.

Her impairment should be expected to last greater than 12 months.

There was no evidence of "malingering" in my examination.

While walking, I believe the use of a cane or the possibility of a walker would
be helpful.

(Doc. #7, PageID at 332-33).

10

**2.**
**Drs. Green and Albert**

In August 2007, Leslie Green, M.D. reviewed the file at the request of the Ohio Bureau of Disability Determinations and assessed Plaintiff's physical residual functional capacity.  (Doc. #7, PageID at 266-74).  Dr. Green opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for six hours during an eight-hour day; sit for a total of six hours during an eight-hour day; and occasionally climb ramps or stairs but never climb ladders, ropes, and scaffolds.  *Id*., PageID at 267-68).  Dr. Green explained that Plaintiff examination in May 2007 showed "normal gait, balance and motor skills.  Lumbar ROM [Range of Motion] painful.  Clmt [Claimant] uses no ambulatory aides.  Her extremities show no edema or deformities.  Clmt has normal ROM. Clmt's reflexes in her patellar are absent.  MRI (7/06):  mod[erate] central canal sten[osis].  Her hyperlipidemia and fatigue are uncontrolled."  (Doc. #7, PageID at 267).  Dr. Green further explained that Plaintiff's psychological consultative examination indicated that her gait was slow and effortful; she was 5'3" tall and weighed 210 pounds; and she had undergone a selective nerve-root injection at her left S1 in January 2006.  And Dr. Green briefly noted "Pain considered" without providing her opinion about the severity and duration of Plaintiff's pain.  (Doc. #7, PageID at 267).

Dr. Green believed that Plaintiff must avoid hazards, such as machinery and heights, due to pain and obesity.  (Doc. #7, PageID at 270).  As to Plaintiff's symptoms, Dr. Green wrote:

11

> After considering the evidence of record I find that the claimant's medically
> determinable impairment could reasonably be expected to produce the alleged
> symptoms, but that the claimant's statements concerning the intensity, duration
> and limiting effects of these symptoms are not entirely credible.  She is able to
> drive, cook, share with her son the domestic chores in the home.

*Id*., PageID at 271.

Dr. Green also checked a box on this form indicating that the record he reviewed did

not contain a treating or examining medical source statement concerning Plaintiff's physical

capacities.  *Id*., PageID at 272.  For this reason, and because Dr. Green's review occurred in

2007, he did not consider the May 2009 opinions expressed either by Plaintiff's long-term

treating physician Dr. Dean or by her examining specialist Dr. Koppenhoefer.

In November 2007, state agency physician, Nick Albert, M.D., reviewed the file and

affirmed Dr. Green's assessment without providing any meaningful analysis.  (Doc. #7,

PageID at 291).


## III.  ADMINISTRATIVE REVIEW

### A.  <u>Applicable Law</u>

The Social Security Administration provides Disability Insurance Benefits to

individuals who are under a "disability," among other eligibility requirements.  *Bowen v.*

*City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term

"disability" – as defined by the Social Security Act – has specialized meaning of limited

scope.  It encompasses those who suffer from a medically determinable physical or mental

impairment severe enough to prevent them from engaging in substantial gainful activity.

*See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  An applicant for

Disability Insurance Benefits bears the ultimate burden of establishing that he or she is under

a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of

Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*,

574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although

a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475

F.3d 727, 730 (6th Cir. 2007), the complete sequential evaluation answers five questions:

1.  Has the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal
    the criteria of an impairment set forth in the Commissioner's Listing
    of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can she perform her
    past relevant work?

5.  Considering the claimant's age, education, past work experience, and
    residual functional capacity, can he or she perform other work available
    in the national economy?

20 C.F.R. § 404.1520(a)(4); *see Ealy v. Comm'r of Social Sec.*, 594 F.3d 504, 512 (6th Cir.

2010).

**B.**    **ALJ Lombardo's Decision**

ALJ Lombardo's pertinent findings began at Step 2 of the sequential evaluation

13

where she concluded that Plaintiff has the following severe impairments: "lumbar degenerative disc disease; degenerative joint disease of the right knee, and obesity." (Doc. #7, PageID at 57). The ALJ concluded that Plaintiff did not have a severe mental impairment.

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the level of severity of an impairment described in Listing "1.02 (other and unspecified arthropathies); 1.04 (disorders of the back (discogenic and degenerative)); 20 (special/other)...," or any other Listing. (Doc. #7, PageID at 59). The ALJ provided no analysis in support of her conclusions at Step 3. *See id.*

At Step 4, ALJ Lombardo concluded that Plaintiff retained the residual functional capacity to perform sedentary work,[2] with several additional limitations: "alternate between sitting and standing every 30 minutes; no kneeling or crawling; occasional crouching and stooping." (Doc. #7, PageID at 59). The ALJ also concluded at Step 4 that Plaintiff cannot perform any past relevant work, including her work as an administrative assistant. *Id.*, PageID at 65.

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability at any time from June 1, 2005, the alleged onset date, through December 31, 2009, the date last insured, and she was therefore not

---

[2] The Regulations define sedentary work as involving the ability to lift "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools...." 20 C.F.R. § 404.1567(a).

eligible for DIB.

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial

15

evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    <u>The ALJ's Review of Medical Source Opinions</u>

Plaintiff argues that the ALJ erred in rejecting the opinions provided by her long-term treating physician, Dr. Dean, and by the one-time examining physician, Dr. Koppenhoefer in violation of 20 C.F.R. §404.1527(d) and Social Security Ruling 96-2p.  Plaintiff further contends that the ALJ's conclusion that Dr. Dean's opinion was not entitled to controlling or deferential weight, or to any special weight, is not supported by substantial evidence.  And Plaintiff maintains that the ALJ failed to consider the length, nature and extent of treatment, or the frequence of examination, when evaluating Dr. Dean's findings.

The Commissioner contends that the ALJ provided sufficient reasons for discounting Dr. Dean's opinions by recognizing that Dr. Dean's treatment notes fail to support his opinions about Plaintiff's limitations and, instead, the treatment notes characterize Plaintiff's "back impairment as 'stable' (or improving) and 'moderate' in severity."  (Doc. #12, PageID at 392).  The Commissioner further points out that Dr. Dean did not explain his extremely limited opinion and his status as Plaintiff's treating physician did not require the ALJ to

16

accept his conclusory opinions.

### B.   Medical Source Opinions

The treating physician rule, when applicable, requires an ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. *See* Social Security Ruling 96-6p, 1996 WL 374180 at *2. Consequently, opinions of state agency physicians are weighed under the same factors as treating physicians including supportability, consistency, and

17

specialization.  *See* 20 C.F.R. 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p 1996, WL 374180 at *2-*3.

**C.** **Analysis**

The ALJ declined to place "controlling or even deferential weight" on the opinions provided by Plaintiff's treating physician, Dr. Dean.  (Doc. #7, PageID at 60).  The ALJ first observed that Dr. Dean's conclusions "are neither well supported by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  This reiterates the criteria necessary under the Regulations and the treating physician rule.  *Blakley,* 581 F.3d at 406.  The question, then, is whether substantial evidence supports this conclusion.

The ALJ found "no diagnostic tests or affirmative clinical findings" consistent with the limitations Dr. Dean imposed.  (Doc. #7, PageID at 60).  Although the ALJ acknowledged that MRIs of Plaintiff's "lumbar spine showed disc bulging," those MRIs revealed, in the ALJ's words, "no encroachment or impingement of the nerve roots."  *Id.* While it is true that the MRI reports did not identify nerve-root encroachment or impingement, Plaintiff's medical records include other objective evidence indicating specific nerve damage in her spine.  According to a report written by Dr. Watson on January 3, 2006, Plaintiff underwent an electrodiagnostic exam, which revealed "very severe" diminished function in Plaintiff's right S1 sural nerve, and a "moderate" diminished function in her left S1 sural nerve.  (Doc. #7, PageID at 216).  Dr. Watson reported, "The findings correlate closely with the symptoms."  *Id.*  About two weeks earlier, Dr. Watson documented that Plaintiff's symptoms included pain in her low back and left leg.  *Id.*, PageID at 217.  Given

18

this evidence, the ALJ was incorrect to the extent she believed the record lacked evidence of neurologic abnormalities in Plaintiff's low back.

The ALJ, moreover, did not cite to other medical evidence or medical source opinion when finding that the MRIs did not support Dr. Dean's opinions.  This was a significant omission because Dr. Dean based his opinions about Plaintiff's work limitations on his list of objective findings including, in Dr. Dean's words, "L5-S1 disc herniation, moderate broad-based bulging of L4-5 disc, moderate broad-based bulging of L5-S1 disc, L2 L3 moderate central stenosis, marked facet arthropathy."  (Doc. #7, PageID at 325).  To find this objective evidence – upon which Dr. Dean relied – as insufficient to support Dr. Dean's opinions, the ALJ was required to rely on other inconsistent medical evidence of record or upon a contrary medical source opinion.  By not doing so with regard to Dr. Dean's opinions, the ALJ erred by substituting her own lay opinion about the insignificance of this objective medical evidence when her lay opinion conflicted with Dr. Dean's opinions. "[A]n ALJ must not substitute his [or her] own judgment for a physician's opinion without relying on other evidence or authority in the record."  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999)("[T]he ALJ cannot arbitrarily substitute his [or her] own opinion for competent medical opinion."); *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004)(ALJ improperly rejected treating physician's opinion "because of the ALJ's own credibility judgments, speculation or lay opinion.").

The Commissioner contends otherwise, arguing that the ALJ noted the opinions of

19

Drs. Green and Albert, who "reviewed the objective medical evidence and opined that Plaintiff could still perform a limited range of light work."  (Doc. #12, PageID at 392).  The first weakness in this argument is that the ALJ did not rely on Drs. Green and Albert as a reason for rejecting Dr. Dean's opinion.  Instead, the ALJ described the opinion provided by Dr. Green and Albert in a paragraph separate from the ALJ's evaluation of Dr. Dean's opinions.  In addition, the ALJ placed some weight on the opinion provided by Drs. Green and Albert "as it is not totally inconsistent with the residual functional capacity found herein...."  (Doc #7, PageID at 61).  This is problematic because a claimant's residual functional capacity is not medical evidence.  It is, instead, an administrative assessment of the claimant's "remaining capacity for work once her limitations have been taken into account.  It is an assessment of what [the claimant] can and cannot do...."  *Howard v. Comm'r of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)(internal quotations and citation omitted); *see* 20 C.F.R. §404.1545(a).  Because the ALJ's assessment of Plaintiff's residual functional capacity constitutes an administrative finding rather than medical evidence, the ALJ erred by relying on Plaintiff's residual functional capacity as a reason for placing some weight on the opinion of Drs. Green and Albert.

The Regulations required the ALJ to weigh the opinion of Drs. Green and Albert under the factors delineate factors of consistency, supportability, specialization, etc.  *See* 20 C.F.R. §404.1527(d)(2)-(6).  The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see also* 20 C.F.R.

§404.1527(f)(2)(ii) (factors apply to opinions of state agency medical consultants); 20

C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-

6p, 1996 WL 374180 at *2.  By not doing so when weighing the opinions of Drs. Green and

Albert, the ALJ failed to apply the correct legal criteria.  Additionally, the fact that Dr.

Albert agreed with Dr. Green's opinion is insignificant because the ALJ failed to evaluate

either physician's opinion under the factors mandated by the Regulations.  And, no

reasonable reviewer could place any weight on Dr. Albert's opinion because it was patently

deficient.  He simply affirmed Dr. Green's opinion without any explanation or analysis.  *See*

Doc. #7, PageID at 291.

The ALJ next rejected Dr. Dean's opinions by finding that "[t]he only plausible

explanation for [Dr. Dean's] pessimistic assessment of claimant's functional capabilities is

that such an assessment was based on an unquestioning acceptance of claimant's subjective

complaint."  (Doc. #7, PageID at 60).  But, as explained above, Dr. Dean relied on the

objective MRI test results.   As a result, and contrary to the ALJ's opinion, there was a

plausible explanation based on objective medical evidence for Dr. Dean's opinions – as he

noted in his report by identifying the specific low-back abnormalities identified in the MRI

reports.  Consequently, substantial evidence does not support the ALJ's finding that "the

only plausible explanation for [Dr. Dean's] pessimistic assessment ... is that such assessment

was based on an unquestioning acceptance of claimant's subjective complaints."

The ALJ also rejected Dr. Dean's opinions because "Dr. Dean has stated that

Plaintiff's spinal stenosis is 'stable'...."  (Doc. #7, PageID at 60).  These brief observations

21

in Dr. Dean's treatment notes say little that is informative about the validity of his opinions. Accepting that Plaintiff's spinal stenosis was "stable" – a relative term – does not conflict with Dr. Dean's opinions. The ALJ did not consider that the relative term "stable" only means that Plaintiff's spinal stenosis had not worsened or improved. The ALJ appears to assume that "stable" refers to a painless or minor condition – an unwarranted assumption where, as here, the ALJ did not connect the term "stable" to the severity or lack of severity in Plaintiff's spinal stenosis. Similarly, the ALJ's finding that Plaintiff's moderate central stenosis at L2-L3, L3, and L4 was stable at times fails to appreciate that the notation "stable" refers to the ongoing abnormal condition in certain areas of Plaintiff's lumbar spine.

The ALJ further discounted Dr. Dean's opinions because Dr. Dean "observed that [Plaintiff] has normal gait, balance, and motor abilities." (Doc. #7, PageID at 60). At this point, the ALJ overlooked or ignored many references in Dr. Dean's treatment notes to the difficulty Plaintiff had with ambulation and gait. For example, on November 27, 2007, Dr. Dean noted that Plaintiff ambulated with an unsteady gait (Tr. 271); on January 24, 2008, Dr. Dean reported that Plaintiff walked with an unsteady gait (Tr. 269); on March 13, 2008, Dr. Dean reported that Plaintiff continued to have moderate low back pain and made it difficult for her to walk to any distance (Tr. 264-65); and on April 19, 2008, Dr. Dean reported that Plaintiff had pain in her right lower extremity that was aggravated by weight bearing, walking, and standing, and was relieved by rest (Tr. 262-63).

Plaintiff also correctly points out that the ALJ did not consider the length, nature, and extent of the treatment relationship, or the frequency of Dr. Dean's examinations, when

22

assessing his opinions.  The ALJ merely acknowledged that Dr. Dean was Plaintiff's treating physician without discussing these factors.  The factors are highly significant, although not dispositive by themselves.  The Regulations explain:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more medical weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we could give it if it were from a nontreating source.

20 C.F.R. § 404.1527(d)(2)(i).  Dr. Dean has seen, examined, and treated Plaintiff many times over the course of many years.  Over the years, he has gained a more complete longitudinal picture of Plaintiff's back and knee impairments than any other physician in the administrative record.  By overlooking or ignoring this, the ALJ erred by not considering factors favorable to Plaintiff.  *See* 20 C.F.R. §404.1527(d)(2)(ii); *cf. Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

Despite the many flaws in the ALJ's evaluation of Dr. Dean's opinion, the Commissioner correctly points out that Dr. Dean's report consists mainly of circles and "X" marks in boxes, with little narrative explanation other than reciting diagnoses of spinal stenosis and insomnia (with no mention of a knee impairment), allegations of daily pain and difficulty walking, and MRI findings."  (Doc. #12, PageID at 392).  These shortcomings – especially the sparse narrative explanation – in Dr. Dean's report are significant and raise

23

the possibility of harmless error in the ALJ's decision.  Indeed, Dr. Dean's sparse narrative explanation weakens the validity of his opinion under the supportability factor.  *See* 20 C.F.R. §404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion...."); *see also Wilson*, 378 F.3d at 546-47 (discussing harmless error).  Yet, the present analysis of the ALJ's review of Dr. Dean's opinions needs no further discussion because of the ALJ's error in evaluating the opinion of Drs. Green and Albert and because the ALJ's evaluation of Dr. Koppenhoefer's opinions contains reversible error.

The ALJ explained that Dr. Koppenhoefer's "opinion is without substantial support from other evidence of record, which obviously renders it less persuasive...."  (Doc. #7, PageID at 61).  Substantial evidence does not support this reason for discounting Dr. Koppenhoefer's opinion.  His report contains a detailed list of the evidence he reviewed and considered when reaching his decision.  The evidence included Plaintiff's MRI and x-ray reports, Dr. Dean's treatment records, Dr. Dean's opinions concerning Plaintiff's limitations, Dr. Green's evaluation of the record, and Dr. Watson's treatment records.  (Doc. #7, PageID at 331-32).  Dr. Koppenhoefer's report, moreover, contains more specific and detailed evaluation of Plaintiff's medical records and the results of his examination than any other medical source provided, including Drs. Green and Albert.

The Commissioner contends that it appears Dr. Koppenhoefer did not review Plaintiff's April 2008 right-knee x-ray, which the Commissioner views as showing no acute findings and only degenerative changes.  (Doc. #7, PageID at 304).  Dr. Koppenhoefer,

24

however, considered this x-ray report because it was included within Dr. Dean's treatment records.  Even if he did not, the x-ray report identifies "at least moderate degenerative changes involving the knee," *id*. (emphasis added), and, therefore, does not directly contradict Dr. Koppenhoefer's opinion of more severe osteoarthritic changes in her right knee.

The ALJ's next provided only a conclusory rejection of Dr. Koppenhoefer's opinion that Plaintiff met Listings 1.02 and 1.04.  The ALJ simply wrote, "The claimant does not meet the listings...." (Doc. #7, PageID at 61).  Elsewhere, at Step 3 of the ALJ's sequential evaluation, she merely stated her conclusion – without analysis – that Plaintiff did not meet or medically equal the level of severity of an impairment in Listing 1.02, 1.04, 20, or any other Listing.  (Doc. #7, PageID at 59).  Because Dr. Koppenhoefer's opinion that Plaintiff met Listing 1.02 and 1.04 was well explained and based on the considerations set forth in each Listing, and because Dr. Koppenhoefer relied on significant medical evidence, it was error for the ALJ to omit a discussion of the factors that led her to reject Dr. Koppenhoefer's opinion.  And, although the Regulations certainly did not require the ALJ to accept Dr. Koppenhoefer's opinion that Plaintiff met certain Listings, *see* 20 C.F.R. §404.1527(e)(2), the quality of Dr. Koppenhoefer's report – which, again, is based on medical evidence and is well explained in terms consistent with Listings 1.02 and 1.04 – required more than a conclusory review by the ALJ.  In addition, the ALJ relied on Dr. Green's report without mentioning that it pre-dated Dr. Koppenhoefer's opinion, and the ALJ failed to mention that no state agency medical source of record reviewed Dr. Koppenhoefer's opinions.

The ALJ also rejected Dr. Koppenhoefer's opinion because he found Plaintiff able to do "occasional" stooping but inconsistently found she could do "no stooping." (Doc. #7, PageID at 61). The ALJ found an inconsistency that does not exist in Dr. Koppenhoefer's report. Dr. Koppenhoefer believed that Plaintiff's "back condition would prevent her from doing activities which would require bending and stooping greater than the occasional basis." (Doc. #7, PageID at 332). He further wrote that Plaitniff "was unable to do stooping, crouching, climb ladders, or very rarely climb stairs with the proper use of railings." *Id*. Given that Dr. Koppenhoefer's first conclusion relates to what Plaintiff's back condition would prevent her from doing; his second conclusion can be reasonably related to how her other impairments, such as her knee impairment, limit her. Even if the ALJ correctly identified an inconsistency, the inconsistently pales in comparison to those factors that support the validity of Dr. Koppenhoefer's opinions that Plaintiff met Listings 1.02 and 1.04, including his thorough examination of Plaintiff, his review and consideration of the medical evidence and opinions of record, and the explanation he provided in support of his evaluation of whether Plaintiff met Listing 1.02 and 1.04. This, moreover, is not an effort to reweigh Dr. Koppenhoefer's opinions; it instead recognizes that the ALJ's reliance on a minor inconsistency does not extinguish her missteps discussed above.

The ALJ also rejected Dr. Koppenhoefer's opinions because he was retained and presumably paid by Plaintiff's counsel "in connection with an effort to generate evidence for the current appeal." (Doc. #7, PageID at 61). This is not a factor specifically identified in the Regulations, although it might possibly arise in some cases under the more general

26

category of "other factors" described in §404.1527(d)(6).  In the present case, the fact of

remuneration adds little or nothing to distinguish Dr. Koppenhoefer's opinion from the

opinions provided by Drs. Green and Albert, who – like Dr. Koppenhoefer – did not provide

gratuitous opinions.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well taken.

## VI.  <u>A SENTENCE FOUR REMAND IS WARRANTED</u>

When an ALJ fails to apply the correct legal standards or when an ALJ's factual

conclusions are not supported by substantial evidence, the Court considers whether to

remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence

Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the

Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan*

*v. Sullivan*, 501 U.S. 89, 99 (1991).  A remand for payment of benefits is warranted only

"where proof of the disability is overwhelming or where the proof of disability is strong and

evidence to the contrary is lacking."  *Faucher*, 17 F.3d at 176.

The evidence of record does not overwhelmingly establish that Plaintiff was under a

disability.  The evidence of disability is also not strong while contrary evidence is lacking.

Consequently, Plaintiff is not entitled to a judicial determination of disability and a remand

for an award of benefits.  *See Faucher*, 17 F.3d at 176.  Yet a remand is warranted for

further administrative proceedings due to the ALJ's errors.  *See Faucher,* 17 F.3d at 176.

On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of

record; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB.

In addition to a Sentence Four remand, Plaintiff seeks a remand under Sentence Six of 42 U.S.C. §405(g). A Sentence Six remand "is a pre-judgment remand..."; it "'does not rule in any way as to the correctness of the administrative decision.'" *Faucher*, 17 F.3d at 175 (quoting *Melkonyan*, 501 U.S. at 98). "In contrast, a remand pursuant to sentence four of § 405(g) is a post-judgment remand ... with a 'final judgment affirming, modifying, or reversing the Secretary's [here, the ALJ's] decision." *Id.* (quoting, in part, *Melkonyan*, 501 U.S. at 98) (other citation omitted). In the present case, a Sentence Six remand is unwarranted because this Report and Recommendation fully considers the correctness of the ALJ's decision and because, in the event this Report and Recommendations is adopted in full, the District Court will enter judgment in Plaintiff's favor and remand this matter under Sentence Four for further administrative proceedings. *See Faucher*, 17 F.3d at 175.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's decision be vacated;

2. No finding be made as to whether Plaintiff Shelley Converset was under a "disability" within the meaning of the Social Security Act;

3. Judgment be entered in Plaintiff's favor and this case be remanded to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.     The case be terminated on the docket of this Court.


February 21, 2013

                                        s/Sharon L. Ovington
                                      Sharon L. Ovington
                               Chief United States Magistrate Judge

29

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).